689 A.2d 1373

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v. SAMUEL MONTESANO, DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued March 5, 1997—Decided March 17, 1997.

Before Judges SHEBELL, BAIME and BRAITHWAITE.

*Philip De Vencentes* argued the cause for appellant (*Galantucci & Patuto,* attorneys; *Mr. De Vencentes,* on the brief).

*Susan W. Sciacca,* Special Deputy Attorney General, Acting Assistant Prosecutor, argued the cause for respondent (*Charles R. Buckley,* Deputy Attorney General—In Charge, Acting Bergen County Prosecutor, attorney; *Ms. Sciacca,* of counsel, and on the letter-brief).

The opinion of the court was delivered by

SHEBELL, P.J.A.D.

Defendant, Samuel Montesano, a/k/a Pio Montesano, Anthony Montesano, appeals the denial of his motion to suppress evidence and his jury convictions for possession of a controlled dangerous substance, marijuana, (*N.J.S.A.* 2C:35–10a(3)), a fourth degree

offense, and possession of a controlled dangerous substance, marijuana, with intent to distribute (*N.J.S.A.* 2C:35–5a(1) and b(10)), a second degree offense. An aggregate prison term of eight years was imposed on these convictions, together with appropriate penalties and fees.

In his brief on appeal, defendant raises the following legal arguments:

POINT I: THE MOTION JUDGE ERRED IN DENYING DEFENDANT'S MOTION TO SUPPRESS.

A. THE POLICE "INVESTIGATORY STOP" OF DEFENDANT WAS WITHOUT OBJECTIVELY REASONABLE SUSPICION, AND VIOLATED DEFENDANT'S RIGHTS UNDER THE FOURTH AMENDMENT AND ARTICLE I, PARAGRAPH 7 OF THE NEW JERSEY CONSTITUTION.

B. THE POLICE LACKED VALID "CONSENT" TO SEARCH THE CONTENTS OF THE PASSENGER'S LUGGAGE FOUND IN THE TRUNK OF THE VEHICLE BEING OPERATED BY DEFENDANT.

POINT II: THE TRIAL COURT ERRED IN ITS INSTRUCTIONS TO THE JURY, REQUIRING REVERSAL OF DEFENDANT'S CONVICTION.

A. THE COURT ERRED IN FAILING TO GIVE A REQUESTED INSTRUCTION ON "MERE PRESENCE" AS AN ESSENTIAL PART OF THE DEFINITION OF "CONSTRUCTIVE" POSSESSION.

B. BOTH THE COURT'S INSTRUCTIONS ON THE ELEMENTS OF *N.J.S.A.* 2C:35–5, AND THE VERDICT FORM PROVIDED TO THE JURY, ERRONEOUSLY RELIEVED THEM OF THE [DUTY] TO FIND A MATERIAL ELEMENT OF THE OFFENSE, I.E., THE WEIGHT OF THE CONTROLLED SUBSTANCE, BEYOND A REASONABLE DOUBT. (NOT RAISED BELOW).

POINT III: THE TRIAL COURT'S FAILURE TO PROVIDE A LIMITING INSTRUCTION SUA SPONTE ON THE LIMITED USE OF CO–DEFENDANT'S POST–ARREST STATEMENT, PURSUANT TO *N.J.R.E.* 105 HAD THE CLEAR CAPACITY TO PRODUCE AN UNJUST RESULT IN THIS CASE. (NOT RAISED BELOW).

POINT IV: THE TRIAL COURT'S FAILURE TO LIMIT THE SCOPE OF THE STATE'S EXPERT WITNESS IN THIS CASE, COUPLED WITH THE COURT'S INSTRUCTIONS ON THE JURY'S USE OF EXPERT TESTIMONY, HAD THE CLEAR CAPACITY TO PRODUCE AN UNJUST RESULT.

I

A detective with the New Jersey State Police, assigned to the Criminal Enterprise and Racketeering Bureau, Criminal Investigation Section, Special Operations Unit, was the State's only

witness at the suppression hearing. During training to become a State Trooper, he was "instructed in detecting and investigating [narcotics] trafficking and distribution." In addition, he has been involved in approximately 400 narcotics investigations as both a detective and a trooper, with about twenty-five of those investigations located in the Fort Lee area.

On November 4, 1992, the detective, while on duty, received information from a confidential source "about suspicious behavior of individuals who were checked into the Days Inn Hotel...." The detective described the information relayed to him by the informant, as follows:

> I was informed that a white female and white male had checked into the hotel approximately 4:00 in the morning. The individuals when checking in came in, paid cash for a one night stay.

> . . . .

> The individuals who checked into the hotel had requested if any messages had been left for them by an individual named Sammy. At that time, they checked in with one handbag each. Prior to the individuals going up to their hotel room, Thomas Miller, who was the white male, went back out to his vehicle, which was parked out in the front of the hotel. He then removed a large suitcase and walked around to a side entrance of the hotel and entered through a side entrance. He then, from what was told to me, got on to the pay phone and started making pay phone calls.

The detective arrived at the hotel with two other State Police detectives and began the investigation at approximately 8:00 a.m. They learned that the two individuals who checked in were Thomas and Hazel Miller, Ohio residents, who drove a red 1991 Ford Explorer, mistakenly referred to as a Bronco. The confidential source had related that, due to the security cameras located at various points in the hotel, Thomas Miller was seen entering the hotel from a side entrance, and that he was carrying a large dark-colored suitcase. The shorter entrance would have been through the front lobby, where he had entered the hotel when he checked in.

After the detectives had set up surveillance in the lobby and in the parking lot, they observed a man, later identified as Michael

Miller, exit the elevator and approach the front desk. His conversation with the clerk was described as follows:

> The individual asked the front desk clerk, he said that he was driving by the hotel and he observed his brother's car out in the parking lot, and he wanted to know what room he was in. The front desk clerk said that he couldn't provide any information. The front desk clerk asked Mike Miller if he was a guest at the hotel, he replied no, he said he was just driving by, he saw his brother's vehicle out in the parking lot, and he stopped in and wanted to know if he arrived safely.

. . . .

> When the clerk wouldn't provide any information he became very belligerent. We then observed Mike Miller walk outside and go up, or approach the Ford Bronco. He looked inside of it, walked around it, then walked back into the hotel, got back on the elevator, and we observed him to go up to the fourth floor.

At about 9:45 a.m. the detectives observed an individual, later identified as the defendant, and Michael Miller exit the hotel. Michael was now carrying a large dark-colored suitcase. It was placed in the trunk of a red Pontiac rental car with New York license plates. The detective did not recall whether the defendant was carrying anything. Michael got into the passenger side and the defendant got into the driver's side, and they began to drive toward the George Washington Bridge.

The detectives followed the car and "[b]ased upon the suspicious nature of the circumstances, . . . made an investigative interdiction of the vehicle . . .", meaning, they pulled the vehicle over. The detective testified that it was the totality of the facts that made him suspicious, not one specific fact taken alone. The detective explained what an "investigative interdiction" meant to him:

> An investigative interdiction approach is a technique that we utilize based upon the totality of circumstances that occur. We don't always, we don't all the time have the ability to see exactly that someone is committing the criminal act, so we know that this approach is legal to approach people, identify ourselves, ask them if they have any objection to us talking with them, we do that, and it's called an interdiction.

> If the people say that they don't want to have any business with us or they don't want to cooperate in any manner with us, then unless we have probable cause to detain them, you know, we either take it a step further or we let them go.

It was his understanding that when making an investigative interdiction they must have "[a]n articulable reason for carrying

the investigation a step further." He said that they did not pull the car over "because [defendant] was doing something wrong in driving."

After the car was stopped, one detective approached the passenger's side, while another approached the driver's side of the car. Both the defendant and Michael Miller were asked for identification. However, only defendant was able to produce any identification. Michael told the detectives that he left his wallet in Las Vegas, where he lived. Michael indicated that they were going to Brooklyn to visit his aunt. Defendant stated they were going to visit his aunt in New York for his birthday. However, defendant's birthday was not until June 29th.

At that point, the detectives began questioning Michael and the defendant separately. Michael was described as being nervous, so much that the Pepto Bismol tablets he took began foaming in his mouth. He was also described as being evasive in his answers, sweaty and shaking. He claimed to be nervous because he was being stopped by the police.

When the detectives requested to search the car, defendant denied he owned anything in the car and executed a written consent to search the car. Michael Miller was not asked for consent to search the suitcase because the defendant "was the renter of the vehicle, and he was also driving the vehicle, he was in control of the vehicle." The detective assumed that, since the defendant was in control of the car, he had the authority to consent to search the luggage inside the car. The detective did not recall Michael claiming ownership to anything in the car, and could not say whether he asked if anything in the car belonged to him. The detectives then searched the vehicle and found approximately 14.8 pounds of marijuana that was wrapped in fifteen individual packages. Most of the marijuana was contained in the large suitcase, but a small amount was found in defendant's gym bag. No contraband was found in the passenger compartment of the car.

Both the defendant and Michael Miller were arrested and searched. No contraband was found on defendant's person. The search of Michael revealed "a small quantity of marijuana" and $3,000 "in thousand dollar increments rolled up in rubber bands." Defendant then, in the presence of the detectives, said to Michael: "I knew that this was going to get us into trouble. You told me not to worry."

After the arrest of the defendant and Michael, at about 10:30 a.m., the detectives returned to the Days Inn Hotel. The detective and his colleague approached Thomas and Hazel Miller's room and identified themselves as State Police detectives. Thomas Miller stated that he did not have any relatives staying at the hotel, although he did have a brother named Tony. The Millers signed a consent form for the search of their room. The search yielded "a small amount of narcotics and ... some paraphernalia[,]" as well as $1,000 "rolled up in rubber bands." When the detectives informed them that Michael Miller and the defendant were under arrest for narcotics, Thomas Miller indicated that he would cooperate. A consent form was executed for their vehicle and the detectives found more marijuana in the glove compartment.

All four suspects were then taken to police headquarters for processing. Both Thomas Miller and the defendant were advised of their *Miranda* rights again. Thomas gave the detectives a statement at the police station regarding his involvement with the marijuana. He stated he was given a sum of money to retrieve a suitcase full of marijuana from the Pittsburgh airport and bring it to New Jersey and deliver it to his brother. He was given two pounds of marijuana as payment for his services, which he placed in his house in Ohio.

At trial, the detective who testified at the suppression hearing and the detective who accompanied him when defendant's vehicle was stopped testified as to the events of the evening in question. A Sergeant of the Bergen County Prosecutor's Office, who is the Administrator and Training Officer of the Bergen County Narcot-

ics Task Force, testified for the State as an expert witness on narcotics. He was in law enforcement for twenty-five years and on the Task Force for four years. He attended basic narcotics investigation courses at the Bergen County Police Academy, advanced courses at the State Police Academy, advanced drug enforcement courses given by the U.S. Drug Enforcement Agency, as well as courses on both criminal investigations and drug abuse. The expert testified he "conducted, participated in or supervised over the years thousands of investigations" and made hundreds of arrests for either possession or trafficking of narcotics. He said he qualified as an expert in narcotics in municipal courts and at least a dozen times in State Superior Court. He was accepted as qualified by the trial court.

The prosecutor then presented an extended hypothetical set of facts to the expert. The witness responded that it was his opinion that the marijuana was possessed with the intent to distribute. He approximated that the confiscated marijuana was worth about $14,000 to $15,000 if sold in bulk or about $35,000 if sold by the ounce. He stated that the marijuana found was divided into half kilo bricks and was manicured for retail sale. The expert also opined that traveling in pairs, nervousness, lack of identification, inconsistent statements and rental vehicles are all consistent with the distribution of drugs. The State then rested. No defense testimony was presented.

## II

Defendant's first assertion of error is that the motion judge improperly denied the motion to suppress. In a written opinion, he found that the detectives had reasonable suspicion when they pulled over the car defendant was driving.

This court agrees that the actions of defendants, when viewed in isolation of each other, may not be out of the ordinary. However, when considering their actions in sequential order and after viewing the picture as a whole, this court is clearly convinced that the detective possessed the requisite suspicion to stop the vehicle.

Furthermore, these detectives were skilled and experienced in narcotics investigations and in identifying activities as typical of those involved in drug dealings.

The detectives in this case learned of a couple who arrived to the motel in the middle of the night, who paid cash and used public telephones, and who transported luggage into the motel through a side entrance. The detectives were justifiably convinced that what had taken place was an attempt by the couple to avoid detection and to avoid leaving a paper trail. This scenario, coupled with the later activities of Montesano and Tony Miller, clearly warranted the detention of the vehicle for investigatory purposes.

When a vehicle is stopped by the police, the occupants are, at that point, "seized within the meaning of the Fourth Amendment of the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution." *State v. Seymour*, 289 *N.J.Super.* 80, 84, 672 *A.*2d 1273 (App.Div.1996); *see also Terry v. Ohio*, 392 *U.S.* 1, 88 *S.Ct.* 1868, 20 *L.Ed.*2d 889 (1968). Neither the United States Constitution nor the New Jersey Constitution bar all searches and seizures; rather, the Fourth Amendment and Article I, Paragraph 7 protect against unreasonable searches and seizures. *State v. Davis*, 104 *N.J.* 490, 498–99, 517 *A.*2d 859 (1986). "An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity." *United States v. Cortez*, 449 *U.S.* 411, 417, 101 *S.Ct.* 690, 695, 66 *L.Ed.*2d 621, 628 (1981)(footnote omitted). The United States Supreme Court explained:

[b]ased upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person of criminal activity.

The idea that an assessment of the whole picture must yield a particularized suspicion contains two elements.... First, the assessment must be based upon all of the circumstances. The analysis proceeds with various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers. From these data, a trained officer draws inferences and makes deductions—inferences and deductions that might elude an untrained person.

. . . .

The second element contained in the idea that an assessment of the whole picture must yield a particularized suspicion is the concept that the process just described must raise a suspicion that the particular individual being stopped is engaged in wrongdoing.

[*Id.* at 417–18, 101 *S.Ct.* at 695, 66 *L.Ed.*2d at 629 (citations omitted).]

The New Jersey Supreme Court has accepted this standard for reasonable searches and seizures. *Davis, supra*, 104 *N.J.* at 502,

504, 517 A.2d 859. The *Davis* Court went on to say that the state constitution required a weighing of "the public interest served against the nature and scope of the intrusion upon the individual." *Id.* at 502–03, 517 A.2d 859.

We are satisfied the detectives had a " 'particularized suspicion' based upon an objective observation that the person stopped has been or is about to engage in criminal wrongdoing . . . [and] based upon the [detective's] assessment of the totality of circumstances. . . ." *Id.* at 504, 517 A.2d 859. The detectives had knowledge that a man and a woman paid for their hotel room with cash; the man, after registering at the front desk, left through the front entrance, obtained a large dark-colored suitcase from his car and then took a longer, more circuitous route back into the hotel; and the man, instead of using the phone in his room, used a pay phone in the lobby to make a phone call. The detectives then observed another man exit the hotel elevator, tell the hotel desk clerk that he had just been driving by and noticed his brother's car, and ask whether his brother had arrived safely. This man denied being a guest at the hotel, even though he entered the lobby from the elevator and not the front entrance. He became belligerent when the desk clerk refused to give him any information, and then proceeded outside to what the detectives knew to be Thomas Miller's car, walked around it and looked inside of it. He then went back into the hotel, where he claimed he was not a guest, and took the elevator to the fourth floor. Thereafter, the man, who professed to have no business at the hotel other than viewing his brother's vehicle by chance, was seen, oddly enough, leaving the hotel with a large dark-colored suitcase, accompanied by another, and driving off towards New York.

In addition to several out-of-state cases, defendant relies on *State v. Arthur,* 287 *N.J.Super.* 147, 670 A.2d 592 (App.Div.), *certif. granted,* 145 *N.J.* 373, 678 A.2d 714 (1996). However, the facts in *Arthur* are distinguishable, as there, the police officers had very few facts to back up their suspicions. *Id.* at 150–51, 670 A.2d 592. Officers conducting surveillance in a high crime area

merely observed a woman enter a parked car where a man was waiting, and then leave the car with a brown bag, after she "looked around in every direction." *Id.* at 151, 670 *A.*2d 592. When the officers stopped the woman and found drug paraphernalia in the bag, they pulled over the defendant. *Ibid.*

This was not a random stop. Rather, the detectives in the present case had a substantial objective basis for a particularized suspicion sufficient to warrant the stop of defendant's car. They had observed suspicious behavior on two different occasions, by two different people and could connect these people by virtue of Michael's inquiry about his brother, Thomas Miller. *Arthur, supra,* does not support defendant's argument that the stop was unlawful. This was more than a mere hunch. When viewed in the aggregate, by trained narcotics officers, the facts satisfy the requirement of a particularized suspicion that criminal activity was in process or about to occur. We, therefore, conclude that the investigatory stop by the detectives was lawful.

### III

Defendant alleges that his consent to search was not valid since the detective did not have reason to believe that defendant owned the suitcase where the marijuana was discovered, and thus, it could not be concluded that the defendant had the authority to consent to the search. Defendant argues that the police knew or should have known that the suitcase was Michael Miller's, and therefore, should have obtained consent from him.

The motion judge held that defendant's consent was sufficient, as follows:

[T]he police were justified in their conclusion that Pio Montesano possessed the requisite authority to consent to the search. The vehicle was rented, defendant Montesano was driving, and only Montesano was able to produce a driver's license. In addition, neither the large suitcase nor the small gym bag had a luggage tag which may have alerted the police as to who owned them. This court rejects defendant, Montesano's argument that because Tony Miller carried the bag from the motel to the car, this is evidence leading to the lack of ownership of the suitcase by Pio Montesano. Here, Tony Miller did not make any affirmative claim of ownership of the suitcase nor did Montesano specifically say that the suitcase

belonged to the passenger, Tony Miller. Therefore, this court finds that the detectives' reliance on the consent given by defendant, Montesano was reasonable and justified.

■ In order for a consensual search to be constitutionally valid, it must have been voluntary. *State v. Johnson,* 68 *N.J.* 349, 353–54, 346 *A.*2d 66 (1975). As stated by our Supreme Court

We conclude that under Art. I, par. 7 of our State Constitution the validity of a consent to search ... must be measured in terms of waiver; i.e., where the State seeks to justify a search on the basis of consent it has the burden of showing that the consent was voluntary, an essential element of which is knowledge of the right to refuse consent.

*[Ibid.]*

It is clear that the defendant's consent was voluntary. He executed a consent to search form after being told by the detectives that it was his right to refuse to consent. This testimony, by both police officers, is uncontradicted and no evidence was presented to the contrary.

■ Nonetheless, defendant contends that he did not have the authority to consent to the search of the luggage, and that the detectives knew or should have known of his lack of authority. We fully agree with the State's position that defendant cannot invoke the rights of a third party, thereby "ignoring the import of his own consent." We do not find a lack of standing on defendant's part. Rather, we find unacceptable his attempt to now limit the consent he gave to a search of a vehicle he clearly controlled. His gratuitous attempt to exculpate himself at the time by asserting that nothing in the car belonged to him did not constitute a limitation on the consent to search he voluntarily granted to the detectives. In these circumstances, the person who may have invoked any argument respecting defendant's alleged lack of authority, apparent or actual, is Michael Miller, not defendant.

■ In both *State v. Maristany,* 133 *N.J.* 299, 627 *A.*2d 1066 (1993) and *State v. Suazo,* 133 *N.J.* 315, 627 *A.*2d 1074 (1993), it was the passenger raising the challenge to the driver's authority to consent to the search, not, as here, the driver challenging his own authority to consent to the search. *Maristany, supra,* 133

*N.J.* at 301, 627 *A.*2d 1066; *Suazo, supra,* 133 *N.J.* at 317, 627 *A.*2d 1074. In any event, both *Maristany* and *Suazo* reflect that the detectives' reliance on defendant's consent to search the vehicle was objectively reasonable. Where the search is based on apparent authority, the law enforcement official must have a reasonable basis to believe that the consenting party has the authority to consent. *Maristany, supra,* 133 *N.J.* at 305–06, 627 *A.*2d 1066; *Suazo, supra,* 133 *N.J.* at 320, 627 *A.*2d 1074. Ordinarily a driver has the authority to consent to the search of the vehicle unless there is evidence that suggests he/she does not have control over the vehicle. *Maristany, supra,* 133 *N.J.* at 306, 627 *A.*2d 1066; *Suazo, supra,* 133 *N.J.* at 320–21, 627 *A.*2d 1074. There is no evidence that defendant did not have control over the vehicle. The rental agreement was in his name. He was the driver of the car and he possessed the keys. Neither he, nor the passenger made any statements to suggest that control of the vehicle was not solely in defendant.

Michael Miller, the only other occupant of the car, was present when the suitcase was found in the trunk and he did not claim ownership or object to the search. There was evidence of constructive possession as both occupants of the vehicle had left the hotel together, after the detectives witnessed suspicious activity by one of those persons, the suitcase was placed in the trunk and the two drove off together. Defendant's denial of ownership is unavailing, as it does not constitute a limitation on his consent to search.

In *Suazo, supra,* the Court found that the passenger's "claim of ownership put the trooper on notice that someone other than the consenting party might have a superior privacy interest in the red bag." 133 *N.J.* at 322, 627 *A.*2d 1074. The Court went on to say that

the preferred procedure for law-enforcement officers seeking consent to search one of several pieces of luggage in a car with more than one occupant is for the officers to determine which occupant owns each item of luggage, so that the officers' reliance on consent to search may be justifiable. *Although adherence to that procedure is not determinative of the validity of a search, defendant's acknowledg-*

*ment that he owned the red bag impelled [the trooper] either to seek defendant's consent or to make further inquiry before opening the bag.*

[*Id.* at 322, 627 A.2d 1074 (emphasis added).]

Here, not only did the passenger not state that the suitcase was his or object to the search of the suitcase, but it is defendant who seeks to repudiate his own consent, not the passenger. We, therefore, find that the defendant's consent included authority to search the suitcase.

## IV

Defendant charges error based upon the trial judge's refusal to charge the jury regarding "mere presence," in accordance with *State v. Shipp,* 216 *N.J.Super.* 662, 524 A.2d 864 (App.Div. 1987). After being requested to give the *Shipp* charge, the judge declined. Rather, he charged the jury on "possession" and "constructive possession," as follows:

The word "possess" as used in our criminal statutes signifies a knowing, intentional control of a designated thing, accompanied by a knowledge of its character. Thus, the person must know or be aware that he possesses the item, in this case, marijuana, and he must know what it is that he possesses or controls, that it is marijuana.

Possession cannot merely be a passing or fleeting thing or uncertain in its nature. In other words, to possess within the meaning of the law the defendant must knowingly procure or receive the item possessed or be aware of his control thereof for a sufficient period of time to have been able to relinquish his control if he chose to do so.

A person may possess an item even though it was not physically on his person at the time of the arrest if he had, in fact, at sometime prior to his arrest, had control and dominion over it.

. . . .

The law recognizes two kinds of possession. They are actual possession and constructive possession. A person is in actual possession of a particular article or thing when he knows what it is, that is he has knowledge of its character, and knowingly has it on his person at a given time.

The law recognizes that possession may be constructive instead of actual. A person who, with knowledge of its character, knowingly has direct physical control over a thing at a given time is in actual possession of it.

Constructive possession means possession in which the person does not physically have the property. But though not physically on one's person, he is aware of the

presence of the property, and is able to exercise intentional control over it and dominion over it.

A person who although not in actual possession has knowledge of its character, knowingly has both the power and the intention at a given time to exercise control over a thing, either directly or through another person or persons, is then in constructive possession of it.

In *Shipp, supra*, we held that mere presence, without more, in a vehicle where a passenger is carrying drugs does not necessitate the conclusion that "he was sharing in the intentional control and dominion over the contraband material." 216 *N.J.Super.* at 666, 524 *A.*2d 864. The facts of that case are helpful in understanding the reasoning behind this conclusion. The defendant in *Shipp, supra*, was a passenger in the front seat of a car that was stopped for speeding, and his step-mother was a passenger in the back seat of the car. *Id.* at 663, 524 *A.*2d 864. The three occupants of the vehicle, the driver, defendant and defendant's step-mother, were ordered out of the car. *Ibid.* Eventually, the police officers found drugs on defendant's step-mother, all three were arrested, and defendant was convicted of possession of a controlled dangerous substance. *Id.* at 664, 524 *A.*2d 864. We found that the conviction could not stand, as intentional and knowing possession was not supported by the facts. *Id.* at 666–67, 524 *A.*2d 864.

More to the point, in *State v. Palacio*, 111 *N.J.* 543, 545 *A.*2d 764 (1988), our Supreme Court upheld defendant's conviction for possession of a controlled dangerous substance. *Id.* at 544, 545 *A.*2d 764. Palacio was a passenger in a car that was stopped for speeding. *Id.* at 544–45, 545 *A.*2d 764. While the driver was attempting to locate his license, the trooper noticed a piece of paper containing figures in his wallet. *Id.* at 545, 545 *A.*2d 764. He suspected that the paper was a drug transaction slip, and the driver became very nervous upon being questioned about it. *Ibid.* The defendant also appeared very nervous. *Ibid.* The driver offered to let the trooper search the trunk, although the trooper declined at that time. *Ibid.* After the trooper was joined by other troopers, they obtained the driver's consent to search and, as a result of the cocaine found hidden in a secret compartment behind

the seat, the driver and defendant were arrested. *Id.* at 545–46, 545 *A.*2d 764.

At Palacio's trial, the judge instructed the jury on actual and constructive possession and told the jury that "it could 'draw inferences from all of the surrounding circumstances and consider them in their totality.'" *Id.* at 547, 545 *A.*2d 764. Additionally, the judge instructed the jury that

> the fact that the defendant was an occupant of a vehicle, which undoubtedly contained cocaine, ... the status of the defendant in relation to the vehicle, how long ... the defendant [was] in the vehicle, ... the proximity of the defendant to the drugs that were ultimately found in the vehicle, ... whether or not those drugs were easily accessible to him, ... his demeanor when he was confronted by the police, his nervousness, if any, [and] his feigning lack of knowledge of the English language, if any.
>
> . . . .
>
> [The jury may also] consider whether or not it was reasonable for him to be an innocent occupant of the motor vehicle, and ... any other evidence or lack of evidence that has a bearing upon the elements in this case, [including] anything that might have, or might not have been found of an incriminatory nature on the defendant's person, [and proximity or lack thereof] ... of the defendant's personal articles ... to where the drugs were located.
>
> [*Id.* at 547–48, 545 *A.*2d 764.]

The *Palacio* Court distinguished the facts from *Shipp, supra,* focusing on the larger quantity of cocaine, the value of the drugs, and the conduct of the defendant as the drugs were being seized as evidence that the defendant had "guilty knowledge of the presence of the drugs." *Id.* at 552, 545 *A.*2d 764.

In the present case, defendant claims that "failure to give the charge on 'mere presence,' despite a specific defense request that it be given, was in this case tantamount to leaving the jury without a standard of lawfulness or unlawfulness with which to assess the acts of the defendant[.]" However, the facts here, as in *Palacio, supra,* lead to the reasonable conclusion that it was not reversible error for the judge to refuse to give a "mere presence" charge.

When reviewing an alleged error in the jury charge, we must view the charge as a whole. *State v. Wilbely,* 63 *N.J.* 420, 422, 307

*A*.2d 608 (1973). The jury charge here was accurate and was sufficient for the jury to find beyond a reasonable doubt that the defendant possessed the marijuana. Taken as a whole, the charge left no room to doubt that "mere presence" was insufficient to bring about a finding of the necessary elements of possession. Defendant was not a passenger in a car, but had rented the vehicle and was driving it. Moreover, he made an inculpatory statement after the drugs were found, evidencing that he had knowledge the drugs were there, and he also had the same drug in a bag which he admitted belonged to him.

Further, the judge charged the jury that:

[p]ossession cannot merely be a passing or fleeting thing or uncertain in its nature. In other words, to possess within the meaning of the law the defendant must knowingly procure or receive the item possessed or be aware of his control thereof for a sufficient period of time. . . .

That charge, combined with the evidence in this case and the jury charge taken as a whole, resulted in an accurate statement of the law and was sufficient for the jury to consider defendant's guilt based on the correct legal standards.

## V

Defendant also claims that the judge relieved the prosecution of its burden of proof regarding the weight of the contraband by virtue of his instructions on *N.J.S.A.* 2C:35–5 and the jury verdict form. Defendant did not raise this issue at trial, and his counsel specifically consented to the form of the jury verdict when asked by the trial judge. *See R.* 1:7–2. Under *Rule* 2:10–2:

Any error or omission shall be disregarded by the appellate court unless it is of such a nature as to have been clearly capable of producing any unjust result, but the appellate court may, in the interests of justice, notice plain error not brought to the attention of the trial or appellate court.

[*R.* 2:10–2.]

The trial judge instructed the jury as to the elements of the offenses with which defendant was charged, in part, as follows:

Mr. Samuel Montesano is charged in the third count of the indictment in that he did knowingly or purposely possess a controlled dangerous substance, namely

marijuana, in a quantity of five pounds or more with the intent to distribute the same.

. . . .

The statute read together with the indictment identifies the elements the State must prove beyond a reasonable doubt to establish the guilt of the defendant on this count of the indictment. They are S–4 in evidence is marijuana. That's number one.

Number two, the defendant possessed or had under his control S–4 in evidence.

Number three, the defendant, when he possessed or had under his control S–4 in evidence, had the intent to distribute S–4 in evidence.

And number four, that the defendant acted knowingly or purposefully in possessing or having under his control with the intent to distribute S–4 in evidence.

The trial judge, as shown above, did not specifically state that the weight of the marijuana was an element of the crime that the jury had to determine. Nonetheless, S–4 in evidence was "approximately 14.8 pounds of green vegetation commonly known as marijuana." There was never any contest as to whether the substance was marijuana or the quantity of marijuana that was contained in the suitcase.

Nonetheless, the jury verdict sheet required the jurors to answer two questions with respect to Count III:

How do you find as to Count 3 of the indictment, charging the defendant, Samuel Montesano, with knowingly or purposely possessing marijuana with the intent to distribute, contrary to the provisions of *N.J.S.A.* 2C:35–5a(1) and *N.J.S.A.* 2C:35–5b(10):

Guilty_____

Not Guilty_____

If you find the defendant guilty, how do you find as to the quantity of marijuana:

_____Five (5) pounds or more

_____One (1) ounce or more, but less than (5) pounds

_____Less than one (1) ounce

It is the prosecution's burden to prove every material element of a crime beyond a reasonable doubt. *State v. Medina*, 147 *N.J.* 43, 49, 685 *A.*2d 1242 (1996); *In re Winship*, 397 *U.S.* 358, 364, 90 *S.Ct.* 1068, 1072–73, 25 *L.Ed.*2d 368, 375 (1970). The Supreme Court has determined that the weight of a controlled dangerous substance is a material element of the offense which

the prosecution must prove beyond a reasonable doubt. *State v. Florez*, 134 *N.J.* 570, 594–95, 636 *A.*2d 1040 (1994); *see also State v. Roberson*, 246 *N.J.Super.* 597, 607, 588 *A.*2d 434 (App.Div.), *dismissed as moot*, 126 *N.J.* 330, 598 *A.*2d 889 (1991).

■ Considering the jury instructions and the form of the jury verdict sheet, it is readily apparent the jury determined the weight of the marijuana beyond a reasonable doubt. The weight of the marijuana was never at issue and, not only did defense counsel fail to object, he agreed to the form of the jury verdict sheet. The jury verdict sheet specifically required the jury to determine whether the quantity was more than five pounds. The issue of the quantity was thereby placed before the jury and they made a determination on that question. The jury was not instructed that it might operate under any other burden of proof than beyond a reasonable doubt. We are satisfied that the State was not relieved of its burden of proof as to the weight of the marijuana and that the failure of the trial judge to label the quantity of marijuana as an element of the offense was not clearly capable of producing an unjust result. *R.* 2:10–2.

## VI

■ Defendant argues that the trial judge erred in not giving the jury a limiting instruction, pursuant to *N.J.R.E.* 105, that the co-defendant's voluntary written statement could only be used against him, and not against the defendant. Again, as defendant failed to raise this issue at trial, we apply the plain error standard. Thus, this alleged error will be recognized only if it has the clear capacity to produce an unjust result. *R.* 2:10–2; *State v. Brown*, 138 *N.J.* 481, 534–35, 651 *A.*2d 19 (1994).

*N.J.R.E.* 105 states

When evidence is admitted as to one party for one purpose but is not admissible as to another party or for another purpose, the judge, upon request, shall restrict the evidence to its proper scope and shall instruct the jury accordingly but may permit a party to waive a limiting instruction.

[*N.J.R.E.* 105.]

Here, defense counsel cross-examined the trooper regarding the fact that the statement did not in any way implicate defendant. Further, the statement does not mention the involvement of the defendant in the crimes his co-defendant admitted to. Therefore, we conclude that the failure to instruct the jury as to the proper use of the statement was not clearly capable of producing an unjust result. *R.* 2:10–2.

## VII

Defendant's final contention is that the State's expert improperly testified to the ultimate conclusion that the defendant possessed the marijuana with the intent to distribute and that the opinion was based on a hypothetical question lacking certain essential facts.

"[A] jury's determination of criminal guilt or innocence is its exclusive responsibility[,]" and if an expert expresses an opinion as to a defendant's guilt or innocence, that testimony is "wholly improper." *State v. Odom,* 116 *N.J.* 65, 77, 560 *A.*2d 1198 (1989). Our Supreme Court has recognized, however, that an expert can testify to the ultimate issue so long as the expert "does not go too far as [to] ... express the view that defendant is guilty of the crime charged." *Ibid.* Further, an expert should not be permitted to testify in this manner when the prejudice would outweigh any probative value of the testimony. *State v. Berry,* 140 *N.J.* 280, 301, 658 *A.*2d 702 (1995). The Court further acknowledged that "the trial court should carefully instruct the jury in the context of the evidence about its duty to decide whether to accept or reject the opinion of the expert witness." *Ibid.*

The Supreme Court was faced with an almost identical situation as encountered here when it decided *Odom, supra.* In that case, the defendant was charged with possession of a controlled dangerous substance with the intent to distribute. *Odom, supra,* 116 *N.J.* at 68, 560 *A.*2d 1198. At trial, the State presented the testimony of an experienced police detective as an expert witness. *Id.* at 68–69, 560 *A.*2d 1198. After hearing a hypothetical based

upon the facts adduced at trial, the expert was asked whether "based on his experiences and such facts if he had an opinion 'whether [defendant] possessed [the drugs] for his own use or possessed them with the intent to distribute them.'" *Id.* at 69, 560 *A.*2d 1198. The detective answered that "it was his opinion that the drugs were possessed with an intent to distribute them." *Ibid.* The Supreme Court held that the testimony was permissible. *Id.* at 81, 560 *A.*2d 1198. The Court reasoned that "under these circumstances, the subject of intent or purpose in connection with the possession of unlawful drugs is a matter of specialized knowledge of experts." *Id.* at 76, 560 *A.*2d 1198. The Court also decided that the opinion of the expert was based on the facts presented to him and that his explanation of the facts "was clearly founded on his experience and specialized knowledge as an expert." *Id.* at 78–79, 560 *A.*2d 1198.

On the facts of this case, the expert's opinion was properly admitted, was based on an adequate hypothetical question, and any prejudice did not outweigh the probative value. The expert was an experienced detective who clearly relied on his experience and training in advancing his opinion. He had twenty-five years experience in law enforcement and had been on the Bergen County Narcotics Task Force for four years. He attended numerous courses in the investigation of narcotics crimes and participated in "thousands" of narcotics investigations. It was based on this experience that the trial court qualified the detective as an expert.

Further, the detective's answer to the hypothetical question was based on the uncontroverted facts presented to him. He was not an investigating officer in the case, *see Berry, supra,* 140 *N.J.* at 301, 658 *A.*2d 702, and he did not offer an opinion that the defendant himself was guilty of the crime charged. He answered only as to the hypothetical and stated that the persons described to him possessed the marijuana with the intent to distribute it. Under *Odom, supra,* testimony which "is expressed in terms that parallel the language of the statutory offense when that language

also constitutes the ordinary parlance or expression of persons in everyday life" is permissible. 116 *N.J.* at 79, 560 *A.*2d 1198.

Importantly, the expert explained the reasoning behind his opinion. The amount of the drugs, the fact that the drugs were found in half-kilo "bricks" and was "manicured", the difference in the value of the drugs bought in bulk as it was discovered, and what it would be sold for if packaged for street sale, the use of a rental car, the fact that there were two people involved and the lack of identification on the co-defendant, were all factors which led him to conclude that the drugs were possessed with the intent to distribute.

Moreover, the judge instructed the jury on the use of expert testimony.

> In this case, Sergeant Warren Chiodo was called as an expert and testified. You are not bound by such expert's opinion but you should consider the opinion and give it the weight to which you deem it entitled, whether that be great or slight, or you may reject it.

> In examining the opinion, you may consider the reasons given for it, if any, and you may also consider the qualifications and credibility of the expert. It is always within the special function of the jury to decide whether the facts on which an expert opinion is based actually exist and the value or weight of the opinion of the expert is dependent upon and no stronger than the facts on which it is predicated.

> In examining the expert witness, the Prosector propounded to him a type of question known in the law as a hypothetical question. By such question the witness is asked to assume as true a hypothetical state of facts and to give an opinion based on that assumption. In permitting such a question the Court does not rule and does not necessarily find that all the assumed facts have been proved. It only determines that those assumed facts are within the possible range of evidence.

> It is for you, the jury, to find from all the evidence whether or not the facts assumed in a hypothetical question have been proved and if you should find that any assumption in such a question of fact has not been proved you are to determine the effect of the failure of proof on the value and weight of the expert opinion based on that assumption.

This instruction was sufficient to alert the jury that it could reject the expert's testimony and that his opinion must be viewed in light of the facts the State has proven at trial. The jury was informed that it was the ultimate finder of fact and that it must determine the appropriate weight to give to the detective's testimony.

We affirm the denial of defendant's motion to suppress and also his convictions.