NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-1028-13T2

STATE OF NEW JERSEY,

        Plaintiff-Respondent,

    v.

AMIR RANDOLPH,

        Defendant-Appellant.

_____

APPROVED FOR PUBLICATION

August 7, 2015

APPELLATE DIVISION

Submitted February 25, 2015 — Decided August 7, 2015

Before Judges Ashrafi, Kennedy and O'Connor.

On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Indictment No. 12-02-0279.

Joseph E. Krakora, Public Defender, attorney for appellant (Emily A. Kline, Designated Counsel, on the brief).

Gaetano T. Gregory, Acting Hudson County Prosecutor, attorney for respondent (Gioiella A. Mayer, Special Deputy Attorney General/Acting Assistant Prosecutor, on the brief).

The opinion of the court was delivered by

KENNEDY, J.A.D.

Following a jury trial, defendant was found guilty of various controlled dangerous substance (CDS) offenses and was sentenced in the aggregate to seven years of imprisonment,

subject to three years of parole ineligibility. Defendant appeals and raises the following arguments:

> POINT I: THE TRIAL COURT ERRED IN FAILING TO GRANT DEFENDANT'S MOTION TO SUPPRESS WHERE THE EVIDENCE SEIZED WAS IN VIOLATION OF DEFENDANT'S FOURTH AMENDMENT RIGHT.

> POINT II: THE COURT COMMITTED PLAIN ERROR BY CHARGING THE JURY ON FLIGHT.

> POINT III: THE COURT ERRED IN FAILING TO GIVE A REQUESTED INSTRUCTION ON "MERE PRESENCE" AS AN ESSENTIAL PART OF THE DEFINITION OF CONSTRUCTIVE POSSESSION.

> POINT IV: THE SENTENCE WAS EXCESSIVE BECAUSE THE TRIAL JUDGE FAILED TO CONSIDER APPLICABLE MITIGATING FACTORS.

We have considered these arguments in light of the record and applicable law, and for reasons expressed hereinafter, we reverse defendant's conviction and we remand for a new trial.

I.

We initially address the Law Division's denial of defendant's motion to suppress evidence. We discern the facts that follow from the record developed at the suppression hearing.[1]

---

[1] "'[O]n appeal, we may only consider whether the motion to suppress was properly decided based on the evidence presented at that time.'" State v. Robinson, 200 N.J. 1, 15 (2009) (citation

(continued)

On September 19, 2011, at about 10:00 a.m., Jersey City Detective Anthony Goodman was conducting a surveillance of the area at Grant Avenue and Martin Luther King Drive in Jersey City — a known high crime area. From his unmarked patrol car, Goodman observed a group of men standing on the sidewalk in front of a three-story apartment building on Grant Avenue (the building). As the group dispersed, one individual, later identified as co-defendant, Markees King, entered the building. Approximately fifteen minutes later, Goodman saw an older man, later identified as co-defendant, Edward Wright, standing across the street from the building who appeared to be watching one of the upper level windows. Goodman noticed King watching the street from a window on the building's second floor.

Shortly thereafter, King exited the front entrance of the building, met briefly with Wright, and engaged in what Goodman believed to be a narcotics transaction. Goodman continued watching as King participated in another hand-to-hand transaction with another individual. King then went back into the building.

_____

(continued)
omitted); see also State v. Tavares, 364 N.J. Super. 496, 501-02 (App. Div. 2003) (on appeal from a judge's decision regarding the justification of a warrantless search, parties generally cannot rely on factual testimony or other proof not submitted as part of the record at the suppression hearing).

Goodman alerted perimeter police units that he "had a sale" and provided a description of Wright. Sergeant Stephen Trowbridge was with a perimeter unit and he stopped Wright a short distance from the building. Trowbridge recovered one glassine bag containing heroin from Wright's pants pocket and placed him under arrest. At this time, Goodman watched King leave the building, and he requested his perimeter units to stop and arrest him. Officers in the perimeter units quickly stopped and arrested King as he walked toward Martin Luther King Drive. A search of King revealed a small amount of marijuana and $132 in small denominations.

Following the arrests of Wright and King, Trowbridge decided to "close in," and began moving from his perimeter location toward the building. However, before Trowbridge got to the front door, a man later identified as Andrew Bentley left the building and began walking toward the vehicle from which Goodman was conducting his surveillance. Goodman testified that Bentley was using a cell phone and he heard Bentley state, "They are at the front door. They're coming in."

Having arrived at the building's locked front door, Trowbridge knocked repeatedly on the door and the first floor windows, until the first floor tenant opened the door and permitted him to enter the building. While in the first floor

vestibule, Trowbridge heard someone "running" from the second to the third floor, and saw a barbeque grill situated near the staircase. He opened the lid to the grill and found a handgun. Within a minute, another Jersey City officer arrived in the vestibule. Trowbridge gave him the handgun and walked up the staircase to the second floor.

From the hallway in the second floor, Trowbridge observed one of the doors to the second floor apartment was open. Peering into the apartment from the hallway, Trowbridge could see "debris thrown about" inside, a couch, and nothing else. He concluded that the apartment was "vacant" or "abandoned," and entered to see if there were "any additional actors in there."

The apartment door opened directly into the living room. Trowbridge walked through the apartment from the back to the front and found no one inside. During this walk-through, he observed in various rooms of the apartment, an open backpack and a pair of shoes near the front door, clothing draped over the couch, a television, and a gaming console. Trowbridge also saw marijuana, empty glassine bags and a small amount of cash on the floor next to the gaming console. Before leaving the apartment, Trowbridge found a silver box containing glassine envelopes of heroin and a Newport cigarette box containing additional amounts of marijuana.

A-1028-13T2

A few pieces of mail were also on the floor near the gaming console, one of which was addressed to defendant, Amir Randolph, on Mallory Avenue in Jersey City.  At this point, Trowbridge left the apartment and walked downstairs where he encountered members of the U.S. Marshals Fugitive Task Force, who, unbeknownst to the Jersey City police officers, were also watching the building at the time.

The federal agents advised Trowbridge they had a warrant for defendant's arrest for an alleged homicide, and believed he either resided there or was staying at the building.  The federal agents then proceeded directly to the third floor apartment where defendant was found hiding in a closet.  A woman and young child also occupied the third floor apartment.  No one from the Narcotics Unit was present when defendant was arrested, and the Marshals subsequently took defendant into custody.  Bentley was also taken into custody by federal agents.

Following the State's presentation at the suppression hearing, at which only Trowbridge and Goodman testified, the judge denied an application by defendant to call Jersey City Detective Matthew Stambuli.  Defense counsel indicated that Stambuli had "investigated" Bentley's cellphone and would testify it was "inoperable."  The State opposed the motion, arguing that the defense had indicated it would offer no

witnesses, and proffered that cellphone records showed the phone was "on and working" on September 19, and had first been cancelled on September 25. The judge then denied defendant's application and explained that there was "no testimony indicating that that phone call was actually made . . ." and that "it's irrelevant to what the police officers did at the time."

The judge denied the motion to suppress and explained, in part, that:

> The door to the second floor apartment was open, and from his vantage point, Sergeant Trowbridge observed that the apartment was vacant.
>
> Sergeant Trowbridge entered the apartment to search for additional actors. He observed drugs, debris and paperwork scattered on the floor of the apartment. Finding no actors, he chose to return to the first floor where he met with U.S. Marshals who informed Sergeant Trowbridge that they had been investigating the premises as the residence of Mr. Randolph.
>
> . . . .
>
> In regards to the search of [the apartment], none of the defendants have provided any evidence that they had an expectancy of privacy in the first floor hallway where the gun was recovered, in the second floor vacant apartment where narcotics, narcotic paraphernalia and paperwork was recovered, or in the third floor apartment where Mr. Randolph was arrested.

> As an overall rule, social and legal norms dictate whether . . . an expectation of privacy will be held to exist and/or be reasonable in particular factual circumstances.
>
> . . . .
>
> Absent any evidence, this Court does not find an expectation of privacy, and as such, the search of [the apartment] is valid. See State versus Linton, 356 New Jersey Super. at 255, at page 256, Appellate Division 2002, holding a defendant who hid his drugs in someone else's vacant property had no reasonable expectation of privacy.

The judge then entered an order denying the motion for suppression.

On appeal, defendant relies upon State v. Brown, 216 N.J. 508 (2014), and argues that the Law Division erred in concluding that defendant had no reasonable expectation of privacy in "someone else's vacant apartment" and that, in making such a finding, the judge improperly imposed a burden of proof upon defendant. The State argues that defendant has no standing to object to the search because police had an "objectively reasonable belief" that the apartment was abandoned, and that, even if the judge's legal conclusions were flawed, the warrantless search was nonetheless valid because "exigent circumstances . . . required immediate police action." In making the latter argument, the State relies, in part, on the alleged fact that "Bentley called [defendant]" to advise police

were entering the building as Trowbridge had gained access to the first floor hallway.

Under the Fourth Amendment of the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution, "[a] warrantless search is presumed invalid unless it falls within one of the recognized exceptions to the warrant requirement." State v. Cooke, 163 N.J. 657, 664 (2000) (citing State v. Alston, 88 N.J. 211, 230 (1981)). The same is true of the warrantless seizure of a person or property. Terry v. Ohio, 392 U.S. 1, 19-21, 88 S. Ct. 1868, 1879-80, 20 L. Ed. 2d 889, 904-06 (1968) (seizure of a person); State v. Hempele, 120 N.J. 182, 216-17 (1990) (seizure of property). It is the burden of the State to show by a preponderance of the evidence that the search falls within a recognized exception to the warrant requirement and that the search was permissible. Brown, supra, 216 N.J. at 527.

In the case before us, it appears that the Law Division concluded the apartment on the second floor was vacant or abandoned and that, consequently, defendant had no reasonable expectation of privacy therein. In reaching this conclusion, the judge apparently found that defendant had a burden of proof to show he had a reasonable expectation of privacy in the

premises.  In reaching these conclusions, the Law Division erred.

In New Jersey, "a criminal defendant [has standing] to bring a motion to suppress evidence obtained in an unlawful search and seizure if he has a proprietary, possessory or participatory interest in either the place searched or the property seized." Alston, supra, 88 N.J. at 228; accord Brown, supra, 216 N.J. at 528-29.  "[S]tanding to seek suppression of evidence" is a "separate issue" from "the existence of a reasonable expectation of privacy," which pertains to the merits of the police action.  State v. Hinton, 216 N.J. 211, 235 (2013).  Defendant's automatic standing to contest the constitutional validity of the seizure "does not equate to a finding that he . . . has a substantive right of privacy in the place searched that mandates the grant of that motion."  Ibid. "'[A]lthough we do not use a reasonable expectation of privacy analysis for standing purposes in criminal cases, we do apply that analysis to determine whether a person has a substantive right of privacy in a place searched or an item seized.'"  Ibid. (quoting State v. Johnson, 193 N.J. 528, 547 (2008)).  "[T]he objective reasonableness of the defendant's expectation of privacy in that property, for purposes of Article I, Paragraph

7, turns in large part on his or her legal right to occupy the property at issue." Id. at 236.

A defendant cannot successfully "challenge a search if an officer had an objectively reasonable basis to believe he was a trespasser." Brown, supra, 216 N.J. at 535. "That follows because a trespasser, by definition, does not have a possessory or proprietary interest in property where he does not belong — where he does not have permission or consent to be." Ibid. Thus, "a trespasser who hides drugs in someone else's vacant and unsecured property" does not have a "'constitutionally-reasonable expectation of privacy'" in that vacant property. Id. at 537 (quoting State v. Linton, 356 N.J. Super. 255, 259 (App. Div. 2002)).

In State v. Smith, 291 N.J. Super. 245, 250-52 (App. Div. 1996), rev'd on other grounds, 155 N.J. 83, 102, cert. denied, 525 U.S. 1033, 119 S. Ct. 576, 142 L. Ed. 2d 480 (1998), for example, the defendant was storing drugs in an apartment without the permission of the tenant, who was in the hospital. We held that because the "defendant had no right to enter the apartment," the "defendant lacked a sufficient privacy interest in the apartment to support the conclusion that the search violated his constitutional rights." Id. at 261.

"Establishing an abandonment of real property is 'a difficult standard to meet.'" Brown, supra, 216 N.J. at 530 (quoting United States v. Harrison, 689 F.3d 301, 309 (3d Cir. 2012)). "'Before the government may cross the threshold of a home without a warrant, there must be clear, unequivocal and unmistakable evidence that the property has been abandoned.'" Id. at 530-31 (internal citations omitted). The test is one of objective reasonableness, State v. Edmonds, 211 N.J. 117, 132 (2012), and turns on whether, given the totality of the circumstances, an objectively reasonable police officer would believe the property is abandoned. Harrison, supra, 689 F.3d at 308. Because the officer's subjective beliefs are irrelevant to this inquiry, a police officer's sincere, good-faith but unreasonable belief that real property is abandoned will not justify a warrantless search when a defendant has an apparent possessory interest in that property. Brown, supra, 216 N.J. at 531.

In Brown, the Supreme Court identified a number of factors to be considered in determining whether a police officer has an objectively reasonable basis to believe a property is abandoned:

> In deciding whether a building is abandoned, or a person is a trespasser, one reasonable step an officer might take is to examine readily available records on ownership of property. Deeds are kept in the county recording office and provide the address of

the property owner. <u>See</u> 13A <u>New Jersey Practice</u>, <u>Real Estate Law and Practice</u> § 33.2 at 502, § 33.10(4) at 508 (John A. Celentano, Jr. (2d ed. 2002).

. . . .

Moreover, utility records, which can be secured by a grand jury subpoena, will reveal not only the name of the property owner, but also whether electricity has been used in the premises. Such record checks are not the exclusive means of determining whether property is abandoned, but just one factor in assessing whether a police officer acted in an objectively reasonable manner.

Other factors to consider in assessing whether a building is abandoned is the property's condition and whether the putative owner or lessee has taken measures to secure the building from intruders. There are impoverished citizens who live in squalor and dilapidated housing, with interiors in disarray and in deplorable condition, and yet these residences are their homes. As succinctly stated, there is not a "'trashy house exception' to the warrant requirement." <u>Harrison</u>, <u>supra</u>, 689 <u>F.</u>3d at 311. Yet, a police officer may be familiar with an unoccupied building with missing doors and broken windows, and an interior in utter shambles and lacking electricity, and reasonably conclude that the structure is abandoned. The decrepit condition of the exterior and interior of a building is a factor, but other circumstances will necessarily come into play. For example the boarding of windows and bolting of doors of a shabby-looking building will suggest an intent to keep people out by a person exercising control over the property and therefore may be evidence that conflicts with abandonment.

. . . .

> A Home is not deemed 'abandoned' merely because a person is dealing drugs from it.

> Id. at 533-34.

Finally, the legitimacy of a search will not depend on what was learned by the police after entry into the home. Wong Sun v. United States, 371 U.S. 471, 484, 83 S. Ct. 407, 415, 9 L. Ed. 2d 441, 453 (1963)("A search unlawful at its inception may [not] be validated by what it turns up.").

The State relies on Linton, supra, 356 N.J. Super. 255, to validate the reasonableness of Trowbridge's belief that the apartment was abandoned. In Linton, two police officers were informed that a man was selling drugs from a certain address in the municipality. Id. at 257. Upon arriving at that address, the officers observed garbage in the front and back yards, a broken lock on the front door, a broken front window, a living room littered with garbage and damaged furniture, and no lights on in the residence. Ibid. Additionally, the officers had not seen anyone at the residence for a month despite frequently patrolling the area. Ibid. We reversed the trial court's suppression of drugs that the officers had found hidden in a torn couch, concluding that there was no Fourth Amendment violation because "a defendant who hides drugs in someone else's

vacant property has no constitutionally-reasonable expectation of privacy." Id. at 259.

Linton is not persuasive here. First, in the case before us, the State offered only a few, equivocal observations about the condition of the apartment. Trowbridge merely saw a couch and what he characterized as "debris" on the floor, when he peered into the open door. The windows in the apartment were intact; one needed a key to enter the locked building; King apparently had a key to get into the locked building; other tenants lived in the building, one of whom permitted Trowbridge to enter; and the door to the apartment itself did not appear to have been forced open. In Linton, by contrast, the police offered much more detail respecting the property at issue.

Second, in Brown, supra, the Supreme Court opined that "whether the evidence of abandonment in Linton meets our current Article I, Paragraph 7 jurisprudence is certainly debatable." 216 N.J. at 538. In Brown, the Supreme Court affirmed our decision upholding the trial court's order suppressing evidence, concluding that the following facts did not objectively support the conclusion that a property was abandoned: one of two front windows to the residence was broken; the front door had a padlock; the rear door was off the hinges and propped closed; trash bags filled with old clothes and soda cans littered the

living room; and the electric meter was missing. Unlike the neighboring houses, the residence in question was not boarded up. Id. at 523. The Supreme Court explained also that nothing in the record showed that some basic research into the ownership of the property "would have been difficult or unduly cumbersome." Id. at 542.[2]

We conclude that, in the circumstances of this case, the fact that the apartment appeared to contain only one couch and "debris" was seen on the floor is an insufficient basis on which to reasonably conclude that the apartment was vacant, unrented or abandoned. The fact that the door to the apartment was left open does not warrant a contrary conclusion. The law is clear that "[t]he Fourth Amendment does not . . . protect only hermetically sealed residences" and the rule prohibiting the police from entering a residence to conduct a warrantless search applies even if the door to the residence is left open. State v. Penalber, 386 N.J. Super. 1, 11-12 (App. Div. 2006) (quoting United States v. Oaxaca, 233 F.3d 1154 (9th Cir. 2000)).

In the circumstances of this case, the State cannot argue credibly that defendant had no expectation of privacy in an apartment where he was allegedly conducting an illegal drug

_____

[2] Goodman testified that while it appeared to him that the landlord was not renting the unit at the time, he "didn't speak to the landlord to verify that."

16

distribution operation. In fact, at one point, the judge determined that the presence of a letter addressed to defendant found inside the apartment was "sufficient evidence" that he "occupied the area." Trowbridge testified that he assumed the apartment was "not rented out" but conceded no effort had been made to ascertain from the landlord or building superintendent whether that was so.

Beyond this, the apartment had furniture inside, as well as a gaming console, other electronic equipment, clothing, bags, Nike sneakers and Timberland boots. This is not consistent with an apartment being abandoned or vacant, and, more importantly, does not suggest in any manner that the apartment is being occupied by a trespasser. Given these proofs, the Law Division erred in finding that defendant had no reasonable expectation of privacy in the apartment.

The Law Division compounded its error by requiring defendant to meet a burden of proof demonstrating his reasonable expectation of privacy. Defendant has no such burden, however. "[T]he State bears the burden of proving by a preponderance of the evidence" that, "in light of the totality of the circumstances, a police officer had an objectively reasonable basis to conclude that . . . a defendant was a trespasser before

the officer entered or searched the home." Brown, supra, 218 N.J. at 529, 535-36.

Now, the State argues that even if the judge's reasoning in denying the suppression motion was flawed, we should nonetheless uphold the order denying suppression on grounds of exigency or protective sweep. While it is true that "we affirm or reverse judgments and orders, not reasons[,]" State v. Maples, 346 N.J. Super. 408, 417 (App. Div. 2002), we decline to do so on the basis of this record, and, given our holding hereinafter reversing defendant's judgment of conviction. Instead, we elect to vacate the order of suppression and remand the issue to the Law Division for further hearing.[3]

In part, our decision to order a further hearing on suppression is prompted by our conclusion that the Law Division erred in refusing to grant defendant's application for leave to call Detective Stambuli as a witness with respect to the operability of Bentley's cell phone. Indeed, we find it

_____

[3] On remand for a rehearing of a pretrial motion to suppress physical evidence, the second trial judge is not bound by the findings of fact or conclusions of law reached by the trial judge in the first instance. State v. Hale, 127 N.J. Super. 407 (App. Div. 1974)(explaining that "law of the case" doctrine most commonly applies to the binding nature of appellate decisions upon a trial court on remand for further proceedings). Accordingly, on remand, the trial court may conduct an expanded hearing to gather additional information relevant to the issue of suppression. State v. Henderson, 208 N.J. 208, 300 (2011).

especially ironic that the State now urges us to accept as a fact that Bentley called "[defendant] and indicated, 'they're at the front door. They are coming in[,]'" when, in fact, the judge made no such finding and explicitly found the claim to be "irrelevant," partially at the urging of the State.

"Where there is a dispute as to material facts on a motion to suppress . . . the trial court should not restrict the State or defendant in the presentation of all relevant evidence so that, if appellate review is had, the record will be complete, and a final adjudication can be made." State v. Hope, 85 N.J. Super. 551, 555 (App. Div. 1964); see also State v. Wilson, 178 N.J. 7, 14 (2003); State v. Gaudiosi, 97 N.J. Super. 565, 568-69 (App. Div. 1967).

In this case, the Law Division denied defendants' motion to suppress without hearing all of the evidence because the judge concluded that potentially key evidence was "irrelevant." Indeed, even if such reasoning were correct, the judge should not have precipitously aborted the hearing without allowing the defense to complete its case. It is not self-evident that the telephonic transmission was irrelevant to the suppression of evidence discovered in the apartment. Moreover, such evidence was at least pertinent to the issue of the credibility of the testifying officer. While we express no opinion regarding the

significance of this evidence, the complexities attendant upon the issues of exigency and protective sweeps underscore the point that the judge should not have undertaken to decide the motion to suppress without hearing all the evidence.

Whether there were exigent circumstances sufficient to justify a warrantless search or seizure is a "highly fact-sensitive" inquiry. State v. Alvarez, 238 N.J. Super. 560, 568 (App. Div. 1990)(internal quotes omitted); see also Johnson, supra, 193 N.J. at 552. The pertinent factors include:

> the degree of urgency and the amount of time necessary to obtain a warrant; the reasonable belief that the evidence was about to be lost, destroyed, or removed from the scene; the severity or seriousness of the offense involved; the possibility that a suspect was armed or dangerous; and the strength or weakness of the underlying probable cause determination.
>
> [State v. Walker, 213 N.J. 281, 292 (2013).]

"[E]xigent circumstances will be present when inaction due to the time needed to obtain a warrant will create a substantial likelihood that the police or members of the public will be exposed to physical danger or that evidence will be destroyed or removed from the scene." Johnson, supra, 193 N.J. at 553.

A protective sweep of the home may only occur when:

> (1) police officers are lawfully within private premises for a legitimate purpose, which may include consent to enter; and (2) the officers on the scene have a reasonable

> articulable suspicion that the area to be
> swept harbors an individual posing a danger.
> Where those substantive conditions are met,
> as a matter of procedure, the sweep will be
> upheld only if (1) it is conducted quickly;
> and (2) it is restricted to places or areas
> where the person posing a danger could hide.
>
> [State v. Davila, 203 N.J. 97, 102 (2010).]

When the sweep is performed in the non-arrest setting, and "not due to the execution of an arrest warrant, the legitimacy of the police presence must be probed." Id. at 126. It is obvious, therefore, that both issues are exquisitely fact-sensitive and require the court's most discerning analysis.

In addition, it is unclear whether the State and the defense presented all evidence relevant to the issues of exigency and a protective sweep — issues that, in any event, were not considered by the Law Division. Therefore, the State should be afforded the opportunity to present any additional evidence it may have relevant to these issues. Defendant also should be afforded the opportunity to present evidence regarding the claimed exigency and protective sweep.

Accordingly, the order granting defendants' motion to suppress is reversed, and the matter is remanded to the trial court for such further hearings it determines, after consultation with the parties, are appropriate.

We turn now to the trial itself and we address defendant's argument that he was denied a fair trial as a consequence of the court's charge to the jury on flight, and the court's refusal to give a "mere presence" charge.

The trial testimony of Trowbridge and Goodman was, in large measure, similar to their testimony at the suppression hearing. However, at trial, both testified in greater detail respecting the alleged cellphone call made by Bentley. Goodman testified that as Trowbridge was knocking on the front door of the building, Bentley, who had left the building moments earlier, walked near the surveillance vehicle with a cellphone held to his face and said, "They're at the door, they're coming in now." He conceded that he could not ascertain who Bentley was speaking to at the time, and that Bentley was not arrested by Jersey City police officers. He added that Bentley was taken from the scene by "another agency."

Trowbridge testified that he "believe[d]" Goodman relayed his purported conversation with Bentley over the radio and that he heard the transmission. Moreover, although he had no awareness that there was anyone inside the apartment on the second floor, he decided to enter that apartment based on Goodman's transmission, and the fact that he had heard someone

22

running on the second floor.  He conceded he could not identify the person he heard running upstairs, and that defendant did not have a cellphone at the time he was arrested.

Trowbridge also testified that "alerting individuals involved in drug activity that there are police present" is a crime; however, he explained that Bentley was not arrested in connection with the narcotics investigation because Bentley's phone call could have been made "for — the reason the other agency was there for or it could have been for what [the narcotics officers] were there for.  [He] didn't determine that. The other agency at the time took [Bentley] with them." Sergeant Trowbridge added, "I couldn't determine if [Bentley] was notifying them that, you know, as part of the drug investigation, or the other investigation that was being conducted."  The nature of the "other investigation" — that the U.S. Marshals were pursuing defendant on a warrant for an alleged homicide — was not revealed at trial.

During the charge conference, defense counsel asked the judge to give the jury a "mere presence" charge, in view of the fact that the only link between defendant and the second floor apartment was the presence of a letter bearing defendant's name. That letter had a different address than the building where it was found.  The only other fact was that defendant was arrested

23                                          A-1028-13T2

in the apartment on the third floor.  The judge declined to give the charge because, in his view, "there is no such charge."

Additionally, the judge gave the jury an instruction on flight as evidence of guilt. Model Jury Charges, Criminal—Flight (May 2010).  The instruction given by the judge on the issue of flight, while otherwise consistent with the Model Charge, nonetheless was untethered to any facts developed at trial.  The judge stated only that "some evidence" had been elicited at trial from which the jury "may infer" that defendant fled.

During the State's closing statement, the prosecutor argued, "You can consider the fact that [defendant] ran from the second floor to the third floor as consciousness of guilt. . . . He was putting distance between himself and those police officers, who he knew, based upon Mr. Bentley's phone call, were on their way into [the building]."  This argument was made without objection by defendant.

At the beginning of the first full day of deliberations, the jury asked the court:

> What happens if we are not unanimous about the decision of one of the Defendants? Was there statements provided about the relationship between Randolph and tenant, Randolph and Markees, Markees and tenant?
>
> . . . .

A-1028-13T2

> Where in the third floor apartment was Randolph arrested from and where was he hiding?

In response, the trial court instructed the jurors that they should rely upon their own memory of the testimony at trial, "use [their] own good common sense[,]" and to send a note if they wanted a read-back of particular testimony. As we have noted, the jury subsequently returned a guilty verdict on all counts of the indictment.

Addressing first defendant's argument that the trial judge erred in refusing to charge "mere presence," we hold that, in the circumstances of this case, the judge's refusal to craft that charge and instruct the jury with respect to its applicability was prejudicial error, despite the judge's comprehensive charge to the jury on the principle of "constructive possession."

"Clear and correct jury instructions are essential for a fair trial." State v. Brown, 138 N.J. 481, 522 (1994). "'A [jury] charge is a road map to guide the jury, and without an appropriate charge, a jury can take a wrong turn in its deliberations.'" State v. Nelson, 173 N.J. 417, 446 (2002) (quoting State v. Martin, 119 N.J. 2, 15 (1990)). Trial courts have a sua sponte obligation to provide correct charges, State v. Robinson, 136 N.J. 476, 489 (1994), and erroneous

instructions are "poor candidates for rehabilitation under the harmless error philosophy." State v. Loftin, 146 N.J. 295, 412 (1996)(quoting State v. Simon, 79 N.J. 191, 206 (1979)).

"Mere presence" at the place where the contraband is located is insufficient to establish constructive possession. State v. Whyte, 256 N.J. Super. 518, 523 (App. Div. 1992). There must "be circumstances beyond mere presence" that permit a reasonable inference of the defendant's intention and capacity to exercise control over the object and the defendant's knowledge of what the object is.   Ibid.; see also State v. Palacio, 111 N.J. 543, 551-54 (1988), and State v. Shipp, 216 N.J. Super. 662, 664-65 (App. Div. 1987).

We recognize that ordinarily the model jury instruction leaves no "room to doubt that 'mere presence' [is] insufficient to bring about a finding of the necessary elements of possession."  State v. Montesano, 298 N.J. Super. 597, 612-15 (App. Div.), certif. denied, 150 N.J. 27 (1997).  However, we have also held that in limited circumstances the jury charge must be tailored to ensure that the jury understands that "mere presence" will not suffice.

In Montesano, we held that an accurate and complete charge on possession and constructive possession, read "as a whole, . . . left no room to doubt that 'mere presence' was insufficient to

bring about a finding of the necessary elements of possession." Ibid. However, in the case before us, given the paucity of proofs connecting defendant to the CDS found in the apartment, and the jury question suggesting that jurors had concerns about the issue, it was incumbent upon the judge to clearly apprise the jury on the law pertaining to defendant's "mere presence" in the building. The failure to do so invited the jury to speculate about a legal issue that required a clear instruction by the judge.

"When a jury requests clarification, the trial judge is obligated to clear the confusion." State v. Conway, 193 N.J. Super. 133, 157 (App. Div.), certif. denied, 97 N.J. 650 (1984). "A question . . . means that one or more jurors need help and that the matter is of sufficient importance that the jury is unable to continue its deliberations until the judge furnishes that help." State v. Parsons, 270 N.J. Super. 213, 221 (App. Div. 1994). Here, the jury's question, reasonably understood, sought guidance from the court respecting the relationship of defendant to the apartment. That question had an unambiguous and well-settled legal answer, which is that defendant's mere presence in the building, without more, is a legally insufficient basis to support a finding of constructive possession, and that "all of the surrounding circumstances" must

be considered in their "totality" in evaluating whether the State has established that a defendant was in constructive possession of contraband. Palacio, supra, 111 N.J. at 547 (quoting the jury charge given by the trial court with approval).

In Shipp, supra, we concluded that the defendant's mere presence, without more, in a vehicle where a passenger is carrying drugs does not necessitate the conclusion that "he was sharing in the international control and dominion over the contraband." 216 N.J. Super. at 666. In Montesano, supra, while we concluded that it was not reversible error for the trial judge to refuse defendant's request to charge the jury on "mere presence," 298 N.J. Super. at 614, we noted that unlike Shipp, the defendant was the driver of a car containing CDS, that he made inculpatory statements after the drugs were found, and that he also had the same drug in his bag which he admitted belonged to him. Thus "the charge, combined with the evidence . . . and the jury charge taken as a whole, resulted in an accurate statement of the law." Montesano, supra, 298 N.J. Super. at 615.

In Palacio, supra, the Supreme Court approved a jury charge which is instructive here. There, a large quantity of cocaine was found hidden in a secret compartment in a vehicle

behind the seat. 111 N.J. at 545. Both the driver and the defendant, a passenger, were arrested. Ibid. At trial, the judge instructed the jury that:

> the fact that the defendant was an occupant of a vehicle, which undoubtedly contained cocaine, . . . the status of the defendant in relation to the vehicle, how long . . . the defendant [was] in the vehicle, . . . the proximity of the defendant to the drugs that were ultimately found in the vehicle, . . . whether or not those drugs were easily accessible to him, . . . his demeanor when he was confronted by the police, his nervousness, if any, [and] his feigning lack of knowledge of the English language, if any.
>
> . . . .
>
> [The jury may also] consider whether or not it was reasonable for him to be an innocent occupant of the motor vehicle, and . . . any other evidence or lack of evidence that has a bearing upon the elements in this case, [including] anything that might have, or might not have been found of an incriminatory nature on the defendant's person, [and proximity or lack thereof] . . . of the defendant's personal articles . . . to where the drugs were located.
>
> [Id. at 547-48.]

The Court explained that the large quantity of cocaine, the value of the drugs, and the conduct of the defendant as the drugs were being seized were evidence that the defendant had "guilty knowledge of the presence of the drugs." Id. at 552.

In the present case, however, the judge gave no instructions to the jury which explicated the significance of its fact-finding.

The judge should have provided direction focusing the jurors' attention on relevant circumstances — the placement and accessibility of the contraband in the apartment and defendant's access to and connection with the apartment and its occupants. Ibid.

We recognize that the model jury charge on constructive possession does not include a charge on mere presence, but the instruction given by the trial court and quoted by the Supreme Court in Palacio illustrates how a court can fashion one that gives the jurors guidance in considering the facts of a particular case.

The difficulty here is that by directing the jurors, in essence, to resolve a question about the law by using "their own good common sense," the judge misinformed them. The question of guilt was for the jury's determination based on their "common sense" consideration of the evidence, but the legal sufficiency of "mere presence" is a matter of law, not a question committed to the common sense of the jurors deciding individual cases. The court's response to the jurors' question, read as whole, was clearly capable of leading the jurors to conclude that they were free to infer that the State proved defendant's constructive

possession by showing that he was in the building. Because we have serious doubt about whether the jurors' verdicts are based on a misunderstanding of the law, we reverse his conviction and remand for a new trial. R. 2:10-2; State v. Macon, 57 N.J. 325, 335-36 (1971).

We shall briefly address the judge's charge on flight, although, given our conclusion above, it is not necessary to do so. Because the issue may arise again at trial, and because we do not wish our failure to address the issue as signaling our approval of the judge's instruction here, we provide the following brief exegesis on the issue of flight.

It is well-established that certain conduct after the commission of a crime may indicate a defendant's consciousness of guilt. State v. Phillips, 166 N.J. Super. 153, 159 (App. Div. 1979), certif. denied, 85 N.J. 93 (1980). To be admissible, the conduct must be "intrinsically indicative of a consciousness of guilt, such as unexplained flight, or an unusual exhibition of remorse for the victim of the crime, or the switching of clothes with a cell mate before a lineup." State v. Pindale, 249 N.J. Super. 266, 283 (App. Div. 1991) (quoting Phillips, supra, 166 N.J. Super. at 160). If the alleged conduct is not intrinsically self-inculpatory but is admitted to show culpability, there is the risk a jury will

impermissibly "speculate, unaided by any evidential base, as to defendant's motive in so conducting himself." Phillips, supra, 166 N.J. Super. at 160.

The most common example of conduct that can give rise to an inference of consciousness of guilt is flight. Flight from custody or the scene of a crime is generally admissible to draw an inference of guilt, State v. Mann, 132 N.J. 410, 418 (1993), if done with the purpose of avoiding apprehension, prosecution, or arrest. Id. at 418-19; State v. Ingram, 196 N.J. 23, 46 (2008); State v. Wilson, 57 N.J. 39, 49 (1970). "Mere departure" is not enough. State v. Long, 119 N.J. 439, 499 (1990).

"For departure to take on the legal significance of flight, there must be circumstances present and unexplained which, in conjunction with the leaving, reasonably justify an inference that it was done with a consciousness of guilt and pursuant to an effort to avoid an accusation based on that guilt." Ingram, supra, 196 N.J. at 46. Accordingly, an adequate jury instruction on flight would require the jury to find not only a departure, but also "a motive for the departure, such as an attempt to avoid arrest or prosecution, that would turn the departure into flight." Mann, supra, 132 N.J. at 421.

Although evidence of flight is generally admissible, "[t]he potential for prejudice to the defendant and the marginal

probative value of evidence of flight," requires the court to carefully consider the manner in which such evidence is presented to a jury.  Id. at 420. The probative value of flight evidence depends on:

> the degree of confidence with which four inferences can be drawn: (1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged.
>
> [Ibid. (quoting United States v. Myers, 550 F.2d 1036, 1049 (5th Cir. 1977)).]

Even in those instances where evidence of a defendant's consciousness of guilt is admitted for another purpose, such evidence must be accompanied by a limiting instruction advising the jury that the evidence is probative for only that other, limited purpose and may not be used to draw any inference of defendant's consciousness of guilt.  See State v. Williams, 190 N.J. 114, 134 (2007).

The conclusion we draw from examining precedent on flight is that such evidence must unequivocally support a reasonable inference that the actor's conduct following the commission of a crime may be relied upon as evidence of the actor's guilt. Given the indirect value of such evidence, and its potential for profound prejudice to a defendant, we do not permit equivocal

evidence to be utilized by a jury in this manner, and we carefully craft a charge to the jury explaining the proper uses and limits of such evidence. On re-trial, the judge must carefully consider whether it is appropriate to charge flight, and, if so, must tailor the charge to the facts of the case to prevent juror confusion.

Finally, given our holdings as set forth above, we need not address defendant's challenge to the sentence imposed.

Reversed and remanded.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION