# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3270-18T3

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

A.F.,

     Defendant,

and

F.F.,

     Defendant-Appellant.

_____

IN THE MATTER OF M.F., M.F.,
M.F., M.F., M.F., M.F., and M.F.,
minors.

_____

     Submitted December 15, 2020 – Decided February 2, 2021

     Before Judges Yannotti and Natali.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FN-07-0107-18.

Joseph E. Krakora, Public Defender, attorney for appellant (Robyn A. Veasey, Deputy Public Defender, of counsel; Isabela Castellanos, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Jane C. Schuster, Assistant Attorney General, of counsel; Joseph J. Maccarone, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minors (Meredith Alexis Pollock, Deputy Public Defender, of counsel; David Valentin, Assistant Deputy Public Defender, on the brief).

PER CURIAM

F.F. appeals from an order entered by the Family Part on April 30, 2018, following a fact-finding hearing, in which the court found that he sexually abused three of his minor children and placed all seven of his children at a substantial risk of harm.[1] We affirm.

---

[1] We use initials and pseudonyms to identify the parties to protect the identity of the children, who were found to be victims of sexual assault or abuse. R. 1:38-3(11), (12).

I.

On September 6, 2017, the Division of Child Protection and Permanency (Division) filed a verified complaint in the Family Part pursuant to N.J.S.A. 9:6-8.21 to – 8.73, N.J.S.A. 30:4C-12, and Rule 5:12-1 to -7, seeking custody, care, and supervision of defendants' seven children: Mark, Mary, Molly, Mina, Mitchell, Mila, and Margaret.[2]  In its complaint, the Division alleged, among other things, that defendant had sexually abused three of the children, and A.F. was a victim of domestic violence.

On September 6, 2017, the court entered an order granting the Division's application for immediate custody, care, and supervision of the children. Defendant and A.F. were ordered to show cause why the children should not remain in the Division's care, custody, and supervision.  It appears that, thereafter, the Division placed the children with A.F.

Defendant did not appear in court on October 5, 2017, the return date set forth in the order to show cause.  Counsel for the Division told the court defendant was missing.  On that day, the court entered an order granting legal and physical custody of the children to A.F., and suspended defendant's

---

[2]  In the complaint, the Division named F.F. and A.F. as defendants.  Because this matter essentially pertains to the allegations of abuse and neglect against F.F., we will refer to him as defendant in this opinion.

A-3270-18T3

visitation pending further order of the court. The family continued to receive services and remained under the Division's care and supervision.

The court entered an order on November 1, 2017, which provided that the children shall remain in A.F.'s legal and physical custody, and under the Division's care and supervision. The order also barred F.F. from having any contact with the children. Following a compliance review hearing on December 21, 2017, the court entered an order which stated, among other things, that the Division was continuing its litigation search for F.F.

The court scheduled the matter for a fact-finding hearing on February 22, 2018, but adjourned the hearing because F.F. was only found and served the day before. The rescheduled hearing began on March 27, 2018. Defendant appeared for the fact-finding hearing and he was represented by counsel.

At the hearing, the Division presented testimony from Ronnie Steinberg, a licensed clinical social worker at the Regional Metro Diagnostic and Treatment Center of Newark Beth Israel Medical Center (NBIMC); Lulu Green, one of the Division's investigators; Dr. Diane Snyder, a psychologist; Bonnie Rogers, a Sexual Assault Nurse Examiner (SANE); Viviana Villalobos, a licensed professional counselor; and Romelia Hasegawa, a child abuse pediatric nurse practitioner.

A-3270-18T3

The Division also presented documentary evidence, which included its investigative files, medical records, and records pertaining to psychological evaluations of the children. F.F. did not testify and presented only two pieces of documentary evidence. The Law Guardian presented no witnesses or evidence.

II.

We briefly summarize the testimony and evidence presented during the fact-finding hearing. A.F. is the biological mother of five daughters: Mary, Molly, Mina, Mila, and Margaret. She is also the mother of two sons, Mark and Mitchell. Defendant is the biological father of all seven children.

On August 28, 2017, at around 9:51 p.m., A.F. reported to the Newark Police Department (NPD) that Mary, Molly, and Mina had informed her they were sexually abused by defendant. At the time, Mary was thirteen, Molly was twelve, and Mina was ten years old. The other children were fifteen (Mark), seven (Mitchell), five (Mila), and two years old (Margaret).

The NPD transported A.F. and the three girls to NBIMC. The police picked up F.F. and brought him to the police station. He refused to answer any questions and was released on the condition that he turn over his house keys to the police.

5

Dr. Ravi Thamburaj examined the three girls upon their arrival at the hospital. Each reported being sexually abused by their father. Mary and Molly were examined by a Sexual Assault Nurse Examiner (SANE), and Dr. Thamburaj and Dr. Veronica Juarez examined Mina.

The examination of Mary indicated that her hymen was not intact, and her vaginal area presented with abrasions and contusions. Molly's examination indicated that her hymen was not intact, but there were no abrasions in the vaginal area. The examination of Mina revealed that she was free from any acute injury requiring medical attention.

During the early morning hours of August 29, 2017, the Division was informed of the alleged sexual abuse. Leyland Bentham, an investigator in the Division's Special Response Unit, responded to the hospital. A.F. told Bentham that on August 28, 2017, she returned home from work at around 6:00 p.m. or 7:00 p.m. She was informed by her daughters that earlier that day, defendant sexually assaulted Mary and Molly. She stated that the sexual abuse must have happened while she was at work.

Bentham then interviewed Mary, and she stated that around lunchtime, her father took her phone and went into his bedroom. Defendant then told her to come into the bedroom because the phone was locked. She said that when she

entered the room, defendant locked the door. According to Mary, defendant started to kiss her on the lips and neck and to remove her clothing. She said he put on all-female pornography and made her watch it. Defendant then tried to put his penis in her vagina.

Mary stated that she tried to push defendant away and he slapped her face. Defendant then put his mouth on her vagina and inserted two fingers into her vagina. She said she was crying, and defendant told her to "stop fucking with him because he [knew] that she like[d] it." After he "finished," defendant told Mary to get her clothes and get out of the room.

Bentham also interviewed Molly. She stated that earlier on the previous day, defendant caught her coming out of the shower and he started sucking on her breast and put his mouth on her vagina. She told Bentham defendant first began to abuse her sexually several months earlier. She claimed defendant forced her to watch all-female pornography. She said she did not tell anyone about the abuse because she was scared defendant would hurt her.

Bentham later interviewed Mark at the family home. She read him the Division's referral which included the sexual abuse allegations. He said his sisters never told him their father had been sexually abusing them. He denied A.F. ever left the children at home unsupervised for a long period of time. He

also indicated that he had never witnessed any domestic violence between his parents.

Later that day, detectives conducted Forensic Video Interviews (FVIs) of the three girls who alleged sexual abuse. Detective Jamilla Ellis of the NPD interviewed Mary and Molly, and Detective Thomas Chung of the Essex County Prosecutor's Office (ECPO) interviewed Mina.

In her interview, Mary stated that she was making lunch when defendant told the children to clean the house, and while the children were cleaning, defendant took her phone and went into his bedroom. Thereafter, the children were playing a game, and defendant told her to come into the bedroom to discuss something he found on the phone. She was suspicious but complied with his request. According to Mary, defendant locked the door, threw her phone on the floor, and kissed her on the lips and neck. She started crying and defendant told her to "stop fucking with me because you know you like this."

The detective asked Mary to provide specific details about defendant's movements in the bedroom. She said defendant told her to "get on the bed." He then pushed her onto the bed and took off her clothing. He turned on a pornographic video on his phone, which showed two naked females kissing. She said defendant made her hold the phone while the video played.

Mary stated that defendant kissed her, touched her vagina, and penetrated her vagina with a finger. When she cried, defendant told her to "shut up" or else he would use two fingers. She described how defendant performed oral sex on her, stating that at one point, when he inserted two fingers into her vagina, she screamed. She said she thought her scream might have alerted Molly and Mina as to what was happening.

Mary also said defendant tried to put his penis in her vagina, but she resisted by keeping her legs closed. The detective asked her whether defendant was circumcised. Mary did not understand the question, but after the detective explained the question, she said she believed her father was circumcised. Mary also stated that while defendant was assaulting her, she heard Margaret come to the bedroom door and ask defendant for food. Defendant yelled for Mina to get the child some food.

Later, she heard one of her sisters come to the door and ask for a drink, and after that, Molly knocked on the door to let her know that Mark had returned with food. She explained that, despite these interruptions, defendant continued to sexually assault her. When Molly continued to knock on the door, defendant told her to get away.

Mary said defendant told her she "had to stop being a pussy because this is what she would have to do when she got older." At some point, defendant told Mary to put on her clothing and get out of the room. After the sexual assault, she went into the living room. Molly asked if she wanted to talk about what happened, but Mary said no and went to take a shower. When she came out, Mina told her that Molly was now in defendant's bedroom.

Mary stated that she and her sisters told their elder brother Mark about the abuse before August 28, 2017. She said that at the beginning of that summer, she and Molly told him that defendant had been touching them sexually. When the detective asked why Mark did not think anything of her being in defendant's bedroom, Mary said he might have thought she was using the toilet in defendant's bathroom because the toilet in the other bathroom was broken.

Mary stated that defendant had been molesting her since she was seven years old. She said defendant often rubbed her vagina, first touching her over the outside of her clothes and then underneath her clothes. She said the sexual abuse always took place in defendant's bedroom. When the detective asked why she did not tell anyone about the abuse, she replied that she felt uncomfortable. She also indicated that she did not want to upset her mother or be blamed for breaking up the family.

A-3270-18T3

In her FVI, Molly stated that before the incident with Mary she had been in the bathroom washing Mina's hair. Defendant told them to get out of the bathroom and clean the house. According to Molly, defendant said they were whores and that they were going to grow up to be sluts. Molly stated that while they were cleaning, defendant tried to call her into his bedroom, but she ignored him.

Molly said that after the children cleaned the house, they were playing cards and defendant called Mary into his bedroom to take her phone. When Mary came out of the bedroom, she was crying. Defendant then called Molly into his room and said, "don't get your sister into this," and "a whole bunch of crazy stuff." Molly told the detective that Mary had given Mark some money to purchase food at the store when he came back from going to the park. After Mark left for the park, defendant called Mary back to his bedroom.

After Mary went into defendant's bedroom, Molly heard her crying. Molly said that she went to her bedroom to try to hear what was going on in defendant's bedroom. She said that when Mary came out of defendant's bedroom the second time, she "wasn't even crying at all." However, when Molly asked her what happened, she replied, "nothing, nothing, nothing."

Molly said that, thereafter, defendant pulled her into his bedroom while she was taking Margaret out of the bath. According to Molly, defendant was only wearing boxer shorts. Once in the bedroom, he started to kiss her on her lips and then threw her on the bed. She said defendant pulled down the top of her dress, removed her underwear, and put pornography on his phone. He made her hold the phone and watch a video, which showed two women using a sexual device. She could not remember if the women in the video were clothed or not.

Molly said defendant touched her breasts and vagina, and then inserted fingers into her vagina and performed oral sex on her. She stated that defendant then put on a condom, which he had removed from a yellow and gold colored wrapper. She said defendant inserted his penis into her vagina, and when he was finished, he flushed the condom down the toilet.

Molly stated that defendant had been abusing her sexually since she was eleven years old. She said that when she was eleven, defendant penetrated her with his penis for the first time, and after she began menstruating, he used a condom. He also made her perform oral sex on him several times, and he performed oral sex on her. In response to the detective's questions, Molly indicated that defendant had been circumcised.

In her FVI, Mina said that on August 28, 2017, defendant asked her sisters to go into the bedroom with him, but they ignored him. He called them whores because they received "B" and "C" grades in school. Mina stated that defendant told the girls to clean the home and at some point, he took Mary's phone. She said defendant later called Mary into his bedroom, and Mary was in there "a while."

Mina stated that she listened at the bedroom door and heard someone crying. She said she and Molly woke up Margaret and told her to go to the bedroom door and say she was hungry. She also encouraged Margaret to cry to get defendant to come out of the room. Mina told the detective that when Mary finally came out of defendant's bedroom she was crying and went to the bathroom to take a shower.

Mina then described how defendant had molested her previously and had threatened to kill her and her sisters if they ever said anything about the abuse. She said the first-time defendant molested her was in late July or early August 2017. She stated that defendant called her into his bedroom then kissed her like "a man and a wife should do." He told her that she would need to start kissing because she would have to do it when she was older. He then touched her vagina

13

with his finger, and when she cried, defendant called her a punk and got off of her. She said the experience made her "sad" and "angry."

Division Investigator Green testified that she interviewed A.F. and each of the seven children. A.F. said defendant had subjected her to verbal, mental, and physical abuse for years. The most recent incident occurred on August 25, 2017, when defendant "choked and pulled her hair" because she refused to have sex with him. Green found that the allegations of abuse and neglect had been substantiated. She said the statements by the girls about the abuse were consistent.

Snyder, Villalobos, and Steinberg testified as experts in the field of child abuse and maltreatment. Snyder conducted a psychosocial evaluation of Molly, Villalobos performed a psychological evaluation of Mary, and Steinberg conducted the psychological evaluation of Mina. Each witness made a diagnosis of "Child Sexual Abuse, Confirmed, Initial Encounter" based on criteria in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013) (DSM-V).

Hasegawa testified concerning her physical examinations of the three girls in October 2017 and indicated the examination results were normal. She found no injuries or residual findings resulting from inappropriate sexual contact,

however, based on the time elapsed since the alleged abuse she would not have expected to. She explained that "any sort of penetrating injuries or anything that happened to them, those injuries would have been healed by the time I saw them."

According to Hasegawa, "[t]he vagina heals pretty quickly . . . if it was a very minor abrasion, like a scratch, that could heal in a few days. If it was something like a tear or a notch was made in the hymen, that would take a few weeks to heal . . . ." She also testified that even painful digital or penile penetration would not always result in bruising or abrasions.

On April 30, 2018, the judge placed his decision on the record. The judge found that Snyder, Villalobos, and Hasegawa were credible witnesses and they had corroborated the girls' out-of-court statements. The judge noted that while Rogers' testimony was "direct and knowledgeable," she had offered no opinions on the alleged sexual abuse and her testimony was of little value.

The judge found the girls' out of court statements were admissible and "[trust]worthy, as they were never recanted, were detailed in nature, and confirmed repeatedly by the minors." The judge also found that each girl's statements corroborated the statements of sexual abuse by the other girls.

The judge stated that all three girls noted defendant's use of condoms and the all-female pornography. They all said the abuse happened in defendant's bedroom. The judge found defendant's flight in the face of the allegations of sexual assault demonstrated his consciousness of guilt, which also corroborated his daughters' statements.

The judge concluded that the Division had sustained its burden of proof and established, by a preponderance of evidence, that Mary, Molly, and Mina were abused or neglected children under N.J.S.A. 9:6-8.21(c) as a result of defendant's sexual abuse. The judge observed that the term "sexual abuse" as defined in N.J.S.A. 9:6-8.84 includes contact or actions between a parent and child for the purpose of sexual stimulation, as well as molestation and other forms of sexual exploitation.

The judge also found the other children were abused or neglected under N.J.S.A. 9:6-8.21(c)(4)(B), as a result of defendant's failure to exercise a minimum degree of care, which placed them at substantial risk of harm. The judge pointed out that the other children were present in the home when defendant's sexual abuse of Mary, Molly, and Mina took place.

The judge found that defendant's "behavior was in reckless disregard to his children" because "he failed to exercise a minimum degree of care by failing

16

to adequately supervise" them. The judge memorialized his findings in an order dated April 30, 2018.

The judge later entered an order, which terminated the litigation. The order continued legal custody of the seven children with A.F. and stated that defendant shall have no contact with the children until after he receives Division-required services. The order also states that any modification of these restrictions would be made in another proceeding, on notice to the Division. Defendant's appeal followed.

## III.

On appeal, defendant first argues that the judge's factual findings are not supported by adequate, substantial, and credible evidence. We disagree.

This court's review of a decision of the Family Part in an abuse or neglect proceeding is strictly limited. N.J. Div. of Youth & Fam. Servs. v. I.H.C., 415 N.J. Super. 551, 577 (App. Div. 2010). The trial court's factual findings are binding on appeal if they are "supported by adequate, substantial and credible evidence." Ibid. (quoting N.J. Div. of Youth & Fam. Servs. v. Z.P.R., 351 N.J. Super. 427, 433 (App. Div. 2002)).

Deference to the trial court's findings of fact is especially appropriate "when the evidence is largely testimonial and involves questions of credibility."

A-3270-18T3

Cesare v. Cesare, 154 N.J. 394, 412 (1998) (quoting In re Return of Weapons to

J.W.D., 149 N.J. 108, 117 (1997)).  Moreover, we give deference to the factual

findings of the judges of the Family Part because that court has "special

jurisdiction and expertise in family matters[.]" Cesare, 154 N.J. at 413.

N.J.S.A. 9:6-8.21(c) provides in pertinent part that a child is abused or

neglected where his or her parent or guardian:

> (3) commits or allows to be committed an act of sexual abuse against the child; (4) or a child whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent or guardian, as herein defined, to exercise a minimum degree of care . . . (b) in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, including the infliction of excessive corporal punishment; or by any other acts of a similarly serious nature requiring the aid of the court;

As the judge noted in his opinion in this case, the term "sexual abuse" is

defined in the Comprehensive Child Abuse Prevention and Treatment Act,

N.J.S.A. 9:6-8.83 to -8.98, to mean

> contacts or actions between a child and a parent or caretaker for the purpose of sexual stimulation of either that person or caretaker for the purpose of sexual stimulation of either that person or another person. Sexual abuse includes:

a. the employment, use, persuasion, inducement, enticement, or coercion of any child to engage in, or assist any other person to engage in, any sexually explicit conduct or simulation of such conduct;

b. sexual conduct including molestation, prostitution, other forms of sexual exploitation of children, or incest; or

c. sexual penetration and sexual contact as defined in [N.J.S.A.] 2C:14-1 and a prohibited sexual act as defined in [N.J.S.A.] 2C:24-4.

[N.J.S.A. 9:6-8.84.]

We are convinced there is adequate, substantial, and credible evidence in the record to support the judge's findings that Mary, Molly, and Mina were abused or neglected children pursuant to N.J.S.A. 9:6-8.21(c)(3) as a result of defendant's sexual abuse. That evidence includes the girls' out-of-court statements describing in detail defendant's sexual abuse, the findings of the psychosocial experts, reports of the medical examinations, and other physical evidence, including the condoms and condom wrapper found in the family home.

We are also convinced there is sufficient credible evidence to support the judge's finding that the other children were abused or neglected under N.J.S.A. 9:8-8.21(c)(4), due to defendants failure to exercise the minimum degree of care of those children which placed them at substantial risk of harm to their physical, mental, or emotional condition.

The term "minimum degree of care" is not defined within the statute, however, it "refers to conduct that is grossly or wantonly negligent, but not necessarily intentional." G.S. v. Dep't of Human Servs., 157 N.J. 161, 178 (1999). The record supports the judge's finding that defendant's sexual abuse of his three daughters, while the other children were in the home, constituted abuse or neglect under N.J.S.A. 9:8-8.21(c)(4).

Defendant argues, however, that there were certain inconsistencies in the girls' statements and the experts' testimony which cast doubt on the veracity and credibility of the allegations of sexual abuse and neglect. He asserts that while the judge reviewed the FVIs of the three girls, the judge seemingly forgot the content of those interviews. He contends the judge failed to address the "strangeness" of Mark's testimony, who was "allegedly" present while the girls were being abused "but did nothing."

Defendant further argues that the judge did not address Mary's "admission" that the only working toilet in the home was in defendant's bedroom, and Molly's "improbable" statement that, at one point, she was "chasing after the toddler." He contends the judge never addressed the issue of where the baby's crib was located, or the changes Molly allegedly made to her statement regarding the assault.

We are convinced, however, that these contentions are entirely without merit. The judge did not err by finding that, when considered in their entirety and along with the other evidence, the girls' statements regarding defendant's sexual assaults were credible and sufficiently corroborated by other evidence presented at the fact-finding hearing. Defendant's contentions regarding the judge's findings of fact lack sufficient merit to warrant further comment. R. 2:11-3(e)(1)(E).

IV.

Defendant also argues that the judge erred by finding the testimony of the expert witnesses to be credible and relying on their testimony as corroboration for the allegations of sexual abuse and as support for his findings. Defendant contends that because these expert witnesses did not view the FVIs of Mary, Molly, and Mina, their conclusions that Mary, Molly, and Mina were sexually abused were unsupported net opinions. We disagree.

N.J.R.E. 702 establishes three primary requirements to admit expert testimony:

> "(1) the intended testimony must concern a subject matter that is beyond the ken of the average juror; (2) the field testified to must be at a state of the art that an expert's testimony could be sufficiently reliable; and (3) the witness must have sufficient expertise to offer the intended testimony."

21

[State v. Townsend, 186 N.J. 473, 491 (2006) (quoting
State v. Torres, 183 N.J. 554, 567-68 (2005)).]

N.J.R.E. 702 allows a qualified expert witness to testify "in the form of an opinion or otherwise."  However, N.J.R.E. 703 requires that the expert give sufficient bases of their opinion.

The rule permits an expert to render an opinion based on facts or data derived from "(1) the expert's personal observations, or (2) evidence admitted at the trial, or (3) data relied upon by the expert which is not necessarily admissible in evidence but which is the type of data normally relied upon by experts in forming opinions on the same subject."  Townsend, 186 N.J. at 494.  The "net opinion rule" is a corollary of the evidence rule, and it precludes "the admission into evidence of an expert's conclusions that are not supported by factual evidence or other data."  Ibid.

As noted, defendant contends the conclusions of the Division's experts were net opinions and could not be relied upon by the trial judge as corroboration for the girls' out-of-court statements that he sexually abused them.  The record shows, however, that the experts each reviewed the records of the investigations by the Division and NPD into the alleged assaults.  The experts also conducted

interviews of the girls and A.F., performed psychological tests, and considered other documentary evidence.

Based on this information, the experts concluded that Mary, Molly, and Mina were victims of child sexual abuse, under the standards and criteria in DSM-V. We are convinced the expert's opinions had sufficient factual support and were not net opinions. Moreover, the expert witnesses were not required to view the girl's FVIs because they had more than enough evidence, including their own interviews with the girls, to support their findings of sexual abuse.

We therefore reject defendant's contention that the experts provided unsupported, net opinions, and his contention the judge erred by relying upon those opinions in concluding that Mary, Molly, and Mina were abused or neglected children as a result of defendant's sexual abuse.

V.

Defendant further argues that the judge erred by inferring guilt from his temporary absence following his questioning and release by the NPD. He contends the Family Part judge never considered the "alternative reasons" for his absence from the court proceedings and failed conduct an evidentiary hearing before drawing the inference of a consciousness of guilt based on his "missing status." Again, we disagree.

A-3270-18T3

"Flight from the scene of a crime, depending on the circumstances, may be evidential of consciousness of guilt, provided the flight pertains to the crime charged." State v. Randolph, 228 N.J. 566, 594 (2017) (citing State v. Mann, 132 N.J. 410, 418-19 (1993)). The model jury charge for criminal matters states, "[O]ur jurisprudence, and common sense all suggest that flight from the scene for reasons unrelated to the crime charged would not be probative of guilt on that charge." Ibid. (citing Model Jury Charges (Criminal), "Flight" (May 2010)).

"Flight will have 'legal significance' if the circumstances 'reasonably justify an inference that it was done with a consciousness of guilt' to avoid apprehension on the charged offense." Id. at 594-95 (quoting State v. Ingram, 196 N.J. 23, 46 (2008)). The "evidence of flight must be 'intrinsically indicative of a consciousness of guilt.'" Id. at 595 (quoting State v. Randolph, 441 N.J. Super. 533, 562 (App. Div. 2015)). However, the evidence need not "unequivocally support a reasonable inference' of the defendant's guilt." Ibid. (quoting Randolph, 441 N.J. Super. at 563 (emphasis added)).

On appeal, defendant argues that there were reasons for his failure to appear at the court proceedings early in this case. He asserts he was locked out of his home and a restraining order precluded him from having any contact with his family. He claims he had no place to go and was "essentially" homeless. He

24

contends the Division's caseworker had not attempted to locate him, and the judge simply accepted A.F.'s assertion that he was "on the run." These arguments lack merit.

We reject defendant's contention that the judge erred by drawing an inference of consciousness of guilt based on defendant's "flight." Defendant did not testify and, therefore, he did not provide the court with an explanation for his failure to appear. The record shows that the NPD questioned defendant regarding the alleged sexual assaults and then released him. Thereafter, defendant could not be found, and the Division issued a litigation search for him. Based on these facts, the judge could reasonably infer that defendant took flight to avoid apprehension on the charges that he sexually assaulted three of his children.

We are convinced, however, that even if the judge erred by drawing that inference, the error was not an error "clearly capable of producing an unjust result." R. 2:10-2. At the fact-finding hearing, the Division presented other evidence which was more than sufficient to support the judge's findings that defendant sexually abused Mary, Molly, and Mina, and that the other children were abused or neglected as a result of defendant's failure to provide them with a minimum degree of care.

We have considered defendant's other contentions and conclude that they lack sufficient merit to warrant discussion.  R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION